24617. McEACHERN, administrator, *v.* INDUSTRIAL LIFE AND HEALTH INSURANCE COMPANY *et al.*

DECIDED JUNE 20, 1935.

Sutherland, Tuttle & Brennan, Blair & Gardner, for plaintiff.
McElreath & Scott, C. M. Dobbs, for defendants.

GUERRY, J. D. W. McEachern, as administrator of the estate of S. C. McEachern, deceased, filed suit in the superior court of Cobb county against the Industrial Life & Health Insurance Company, J. N. McEachern Jr., individually and as executor of the estate of J. N. McEachern, deceased; R. H. Dobbs Jr., individually, and as executor of the estate of R. H. Dobbs, deceased; I. M. Sheffield, George O. Sheffield, I. M. Sheffield Jr., Evelyn Sheffield Thompson, and Mrs. Lula D. McEachern, for the recovery of cer-

tain stock certificates or their value, alleged to be $400,000. It appears from the petition that S. C. McEachern, father of the plaintiff, entered into a contract on September 3, 1924, with J. N. McEachern, under the terms of which S. C. McEachern agreed to sell to J. N. McEachern 500 shares of stock of the Industrial Life and Health Insurance Company for the sum of $300,000. This contract (omitting formal parts) is as follows: "That for value received, the party of the first part does hereby agree to pay to the party of the second part, his heirs and assigns, the sum of $300,000; said sum payable as follows: $30,000 cash, this day paid, the receipt whereof is hereby acknowledged, and the balance of $270,000 in installments as follows: $7500 on the first day of March, 1925, and a like sum of $7500 on the first day of each and every third month thereafter until the full balance of $270,000 is fully paid; said installments shall bear no interest before maturity, but after maturity said installments shall bear interest at the rate of 8% per annum until paid. As a part of the consideration of the payment of said sums of money, as aforesaid, the party of the second part does hereby agree to sell and transfer to the party of the first part, his heirs or assigns, the 500 shares of the capital stock of the Industrial Life & Health Insurance Company now owned by the party of the second part. The agreement of the party of the second part to sell and transfer said stock is to be construed as a conditional agreement of sale, to become absolute upon the full payment of the said sum of $300,000, according to the tenor and effect of this instrument. As a part of the consideration of the payment of said sum of money by the party of the first part, the party of the second part agrees to resign as vice-president and as a director of the Industrial Life and Health Insurance Company, and that his salary as such vice-president and director shall cease from the date hereof. The party of the second part has endorsed the certificates of his said shares of stock in blank, and has deposited the same with the party of the first part, and the party of the first part acknowledges the receipt of said certificates of stock, and agrees to hold the same in trust until the several sums of money herein agreed to be paid by the party of the first part shall have been fully made. Said stock shall not be transferred on the books of the company until the payments herein agreed to be made by the party of the first part have been fully and completely made, but the party

of the first part shall have the right to receive all dividends which may be declared and paid on said shares of stock as long as the party of the first part is not in default in the making of the payments herein agreed to be made. Should the party of the first part, or his heirs or assigns, make default in any of the above payments, and should said default continue for a period of ninety days, then said shares of stock shall be on demand returned to the party of the second part, and this agreement canceled, and the party of the second part shall be restored to all of his rights as owner of said shares of stock, and any payments which the party of the first part, or his heirs or assigns, may have theretofore paid, shall be forfeited to the party of the second part in consideration of his loss of salary as an officer and director of the company and of the dividends which he would or might have drawn as a stockholder prior to such forfeiture."

It appears further from the petition that J. N. McEachern transferred his rights under the contract to R. H. Dobbs and I. M. Sheffield by an assignment of the certificates. All installments due under the contract were paid with the exception of the last amounting to $7500, due December 1, 1933. On December 1, 1933, I. M. Sheffield mailed to the plaintiff his personal check in the sum of $1875, representing his proportionate part of the last installment. Plaintiff received and cashed this check. On or about the first day of December, 1933, R. H. Dobbs Sr. mailed to plaintiff, and plaintiff received, on or about the 2d day of December, 1933, the personal check of Dobbs for $5675, representing his proportionate share of said last payment, and which amounts totaled $7550, $50 in excess of the amount of the last installment. In the same mail he received from Dobbs a letter stating as follows: "In mailing you check yesterday for the final payment on the stock contract, I find that we made an error of $50 in the amount sent you, that is, I made my check for $5675 and it should have been for $5625, so kindly send me check for $50, the amount of the overpayment, thanking you," etc. The petition further alleges that the plaintiff, instead of depositing the check and mailing to Dobbs a check for $50, went to Atlanta for the purpose of seeing Dobbs and delivering the check and obtaining one for the correct amount; that he was unable to see Dobbs, and then, a few days later, he again called at his office in Atlanta, for the purpose of making the exchange, but

was again unable to see him, and that on the 10th day of December, 1933, Dobbs died, and thereupon plaintiff took the check for $5675 to the Citizens & Southern National Bank of Atlanta, the bank on which it was drawn, and presented it for payment, stating to the officer of the bank to whom he presented it that he understood the maker was dead; and that the bank refused to pay the check on the ground that the maker was deceased. On the 12th day of January, 1934, plaintiff received a letter from the defendant R. H. Dobbs Jr., as follows: "I am inclosing copy of letter written to you by my father, dated December 2, 1933, in which he stated that in sending check for final payment of stock in the Industrial Life and Health Insurance Company an error was made in the check, in which an overpayment of $50 occurred. Having received no reply whatsoever to this letter, I am writing you, requesting you to give the matter your immediate attention, as I am endeavoring to close up the unfinished business of my father's estate as soon as possible." The petition further set forth that plaintiff, by reason of the fact that the bank had refused to honor the check of R. H. Dobbs, was unable to comply with the request contained in the letter of R. H. Dobbs Jr., and therefore did not attempt again to deposit the check and mail his check for $50; that no payment of the amount of $5625, together with legal interest, was made until March 28, 1934, when plaintiff received a letter from R. H. Dobbs Jr., inclosing a check for $5625, and requesting that plaintiff return the check for $5675 by return mail; that plaintiff refused to accept said check and on the 17th day of April, 1934, returned both of said checks to R. H. Dobbs Jr., executor of the estate of R. H. Dobbs, deceased. It was alleged that on April 7, 1934, a person purporting to act on behalf of R. H. Dobbs Jr. tendered plaintiff the sum of $5,756.25 for the surrender of the two checks, which offer was refused by plaintiff. Defendants' general demurrer was sustained and the petition dismissed. Plaintiff excepts to that ruling.

Plaintiff contends that, the stock having been sold under a conditional-sale contract and defendant having defaulted in the payments, he had a right of action to recover the property. Plaintiff further says that ordinarily, where the plaintiff elects to take back the property, he must account for the purchase-money paid, but that under the terms and conditions of the contract, that is the payment of the accrued dividends to the defendants and plaintiff's

relinquishment of claim for salary, the necessity for any return of the purchase-price was obviated. Under the view we take of the case, it will not be necessary to consider the question of liquidated damages and return of purchase-money as a condition precedent to a recovery of the stock. It is apparent that this contract was intended by the parties to give authority to the purchaser to sell or assign any particular amount of the 500 shares of stock. This was in fact done almost at the beginning of the contract, and it is clearly inferable that payment of the purchase-price had been made by the assignees of their proportionate part of the stock. Payments of $7500 every three months had been made from December, 1924, until December, 1933, when the last installment of $7500 was due. Plaintiff bases his right to recover the stock on the failure of the defendants to comply with the terms of the contract, that is, the payment of this last installment. The question, is, therefore, was there such a failure to pay on the part of the defendants as amounted to a breach of the contract. On December 1, 1933, there fell due the last installment of $7500 due under the contract. I. M. Sheffield, to whom part of the stock had been assigned by the purchaser in 1924, mailed to plaintiff on that date his check for $1875, which represented final payment on 125 shares of stock. Plaintiff received and cashed this check. On the same date R. H. Dobbs, the holder of the balance of the stock, mailed to plaintiff his check for $5675, which amounted to a $50 overpayment under the terms of the contract. This check was received by the plaintiff, together with a letter calling attention to the fact of the overpayment and requesting plaintiff's check in the sum of $50. It is to be noted that no conditions were attached to the presentation of the check for payment. The plaintiff's right to cash the check was expressly recognized, and the letter only requested plaintiff's check for $50, and it is undisputed that this amount was correct as an overpayment. The petition does not allege that the check was not a valid check and would not have been paid if presented. Plaintiff does allege that he held the check until December 10, without notifying any one, and at that time Mr. Dobbs died. After the death of Dobbs, plaintiff actually presented the check to the Citizens & Southern Bank, the bank on which it was drawn, and payment was refused by the bank for the reason that the drawer of the check was dead. Plaintiff continued to hold the check with-

out returning it, and on January 12, 1934, R. H. Dobbs Jr. wrote him to please give the matter "your immediate attention." Plaintiff made no reply to this letter, nor did he return the check. R. H. Dobbs Jr., as executor of his father's estate, on March 28, 1934, sent plaintiff his check for $5625, and this check was held until April 17, when both checks were returned to R. H. Dobbs Jr. On April 7, R. H. Dobbs Jr., had tendered to defendant in cash the sum of $5756.25 for surrender of the two checks, and this sum was refused.

"It is the general rule that bank checks are not payment until themselves paid, the presumption being that the payee of a check takes it for collection and application rather than as payment in and of itself. Civil Code (1910), § 4314. However, one receiving a bank check for collection and application must exercise reasonable diligence in presenting it for payment, and if he negligently holds it for an unreasonable time, without presentation, it is at his own risk. *Lester-Whitney Shoe Co.* v. *Oliver Co.,* 1 *Ga. App.* 244 (58 S. E. 212)." *National City Co.* v. *Athens,* 38 *Ga. App.* 491 (144 S. E. 336); *Sanders* v. *Lifsey,* 41 *Ga. App.* 395 (153 S. E. 104). "A check is a commercial device intended to be used as a temporary expedient for the actual money. It is generally designed for immediate payment and not for circulation, and therefore it becomes the duty of the holder to present it for payment as soon as he reasonably may; and if he does not, he keeps it at his own peril." *Kennedy* v. *Jones,* 140 *Ga.* 302 (78 S. E. 1069, Ann. Cas. 1914D, 355), and cit. In *Comer* v. *Dufour,* 95 *Ga.* 378 (22 S. E. 543, 30 L. R. A. 300, 51 Am. St. R. 89), it was said: "If the holder of a bank check neglects to present it for payment within a reasonable time, and the bank fails between the time of drawing and the presentation of the check, the drawer is discharged from liability to the extent of the injury he has sustained by such failure; an indorser is discharged absolutely. . . What is a reasonable time will depend upon circumstances and the relation of the parties between whom the question arises. When the facts are undisputed, the question is one of law to be determined by the court. If the check is received at a place distant from the place where the bank upon which it is drawn is situated, and is forwarded by due course of mail to a person in the latter place for presentment, the person to whom it is thus forwarded has

until the close of banking hours on the next secular day after he has received it to present it for payment, unless there are special circumstances, which require him to act more promptly." In *Tomlin* v. *Thornton*, 99 *Ga.* 585 (27 S. E. 147), it was said: "If the bank drawn upon is at a place distant from that at which the payee receives the check, and fails before the check is presented, it will, as a general rule, be a question for a jury, in the light of all the attendant facts and circumstances, to determine whether or not due diligence was observed in presenting the check." In this same opinion this extract from 3 Am. & Eng. Enc. L. 213, was quoted with approval: "If the bank on which the check is drawn be in the same place where the payee received the check, it should be presented for payment within banking hours on the day it is received, or on the following day. If in the meantime the bank fails, the loss will be the drawer's." When the circumstances are not definite as to the particular time a check might reasonably have been presented, the solution of such a question is necessarily a matter for the determination of a jury. This is what was decided in *Haralson* v. *Umatilla Citrus Growers Asso.*, 47 *Ga. App.* 36 (169 S. E. 542). When all reasonable deductions from a given state of facts demand a certain conclusion, the court may draw them for itself.

The record shows that plaintiff lived at Marietta and defendants in Atlanta, Fulton county; that a check was sent plaintiff on December 1, and reached him on December 2; that it was drawn on the Citizens & Southern Bank of Atlanta; that plaintiff came to Atlanta twice between December 2 and December 10 and did not present the check for payment, although he was looking for the drawer of the check. He made no effort to collect the check in any manner whatsoever, but continued to hold it until after December 10, when the maker died. It is not alleged that the maker did not have sufficient funds in the bank on which the check was drawn to pay it when presented. The check was not presented at all within eight days after it was received, nor was it attempted to be collected by the payee. Certainly, under the allegations of the petition, had the bank failed on the 10th day of December the payee would have suffered the loss.

While it is true that a promissory note or bank check is not payment until it is itself paid (Civil Code (1910), § 4314), it has never been held where a bank check, not objected to on the ground

that it is a check and not money, may not be or is not a good or valid tender when the check is not returned and no objection of any kind made thereto within a reasonable time. We think it clear, where A owes to B a sum of money and sends to B a check for such sum, and B receives and keeps the check, without objection to the manner of payment, and does not return it, that this conduct on the part of B would prevent him, in a suit afterwards filed against A for such sum, from recovering interest and cost thereon, where it is not contended that the check would not have been honored if presented within a reasonable time. It is true that A could not set up a payment thereby unless he could also show that such failure on the part of B to present the check within a reasonable time had resulted in loss and damage to him. Most of the cases dealing with this subject in Georgia are where a debtor has sent to a creditor a bank check in payment of an account on a bank where the debtor had a sufficient sum of money with which to pay the check, and the creditor is alleged to have held the check an unreasonable length of time without presenting it for payment, and the bank failed. In those cases, holding the check may amount to payment, where loss occurs to the debtor. The circumstances of the transaction and what was a reasonable time for the presentation are usually questions for the jury, especially where the facts as to the presentation are indefinite.

The allegations of this petition show that plaintiff was in receipt of a check, which was not alleged to be invalid at the time it was received by plaintiff, and plaintiff continued to hold the check until after the period within which the contract might be forfeited, and during that time did not make any attempt to send the check back to the drawer or his representative, nor did he reply to defendant's letter in respect thereto. In *Veal* v. *Security Mutual Life Ins. Co.*, 6 *Ga. App.* 721, 724 (65 S. E. 716), it was said: "Where a check or promissory note is given for a pre-existing debt, the transaction is not, however, without legal incidents and effects. Payment is not necessarily effectuated, but the creditor holds additional evidence that there is an indebtedness; and further, the rate of interest may be changed, and the time of the maturity of the debt may be extended." In the above case the insured on the last day of grace under the terms of his policy sent to the insurance company a check for the premium due, and the company sent its premium re-

ceipt therefor. When the check was presented to the bank, payment was refused because of the lack of sufficient funds. The company then wrote to the insured, after the days of grace had expired, that the check had been dishonored, and asked that another check be sent, covering interest and protest fees. "When this is done we will return to you the protested check." The insured wrote, explaining failure of the bank to pay, and asked that the check be presented a second time, which request was complied with, and the check was again dishonored. The company then notified the insured that the policy had lapsed, but stated they would be glad to consider an application for reinstatement. The insurance company did not return the check, and the insured died within two months time. The company, having kept the check, which was a valid obligation against the insured, and after its dishonor asked payment thereon, was held to have accepted the check in lieu of the premium. See, in this connection, *Sims* v. *Jefferson Standard Ins. Co.,* 18 *Ga. App.* 347 (89 S. E. 445) ; *Chandler* v. *American Central Life Ins. Co.,* 27 *Ga. App.* 810 (109 S. E. 919). Indeed, in Restatement of the Law of Contracts, by the American Law Institute, § 306, it is said : "Where performance of either condition or promise requires the payment of money, and tender is made of a valid check or of some form of currency which is not legal tender for the purpose, and the tender is rejected without a statement that the ground of objection is the medium of payment, the tender is not thereafter open to that objection, if legal tender could have been obtained and seasonably tendered had objection to the medium of payment been stated." In Gunby *v.* Ingram, 57 Wash. 97 (106 Pac. 495, 36 L. R. A. (N. S.) 232), it was said : "It may be conceded, we think, under universal authority, that a strictly good tender can not be made by the offer of a check for the amount due. But it is well established that the creditor may waive the character of the money which is tendered by raising no objection to the payment, for the reason that it is not the character of money or specie that is called for in the obligation, or by raising some other objection which would exclude the idea of objecting on that ground. Considering the fact, which is a matter of common knowledge, that probably 90 per cent. of the business of the mercantile world is now done through the medium of checks, drafts, etc., instead of by the transfer of gold and silver coin, it would be

a dangerous rule to announce, and one which could easily be turned into an engine of oppression, if the tender of a payment, especially where it involved the maturing of obligations which were not then due, could not be made by check, where no question was raised as to the value of the check tendered." This principle will apply with equal force where the question of forfeiture is involved. Forfeitures have never been favorites of the law. "Courts will readily seize upon conduct or circumstances arising subsequently on the part of parties, to imply a waiver." *Eaves* v. *Georgian Co.*, 47 *Ga. App.* 37 (169 S. E. 519). If the failure to present a check within a reasonable time, whereby loss ensues to the drawer of the check, may operate as actual payment of the debt for which the check is given, it would certainly seem that where the payor of a series of obligations, nine years in process of payment and all paid save the last, sent a check for the last payment promptly upon maturity of the last payment, the payee, in order to rescind the contract and take back the property sold, which had increased in value, could not withhold the check from presentation for payment and claim that the contract was breached by the maker. Especially is this true when it is shown from the petition that the payee never made any attempt to communicate with or reply to the maker of the check or his representatives, although requested in writing to do so. The defendants in this case may be still bound for the remainder due under the last payment, it not appearing that they have sustained any loss by reason of the nonpresentation. However, they have not committed such a breach of the contract as will support a forfeiture or rescission of it, and the general demurrer was properly sustained on this ground, no judgment being prayed for on the contract.

*Judgment affirmed.* *Broyles, C. J., and MacIntyre, J., concur.*